```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - -     x
                                :
UNITED STATES OF AMERICA        :
                                :
    - v. -                      :
                                :   SEALED INDICTMENT
DOUGLAS LATCHFORD,              :
    a/k/a "Pàkpong Kriangsak,"  :   19 Cr. ____
                                :
            Defendant.          :   19 CRIM 748
                                :
- - - - - - - - - - - - - -     x
```

## COUNT ONE
## (Wire Fraud Conspiracy)

The Grand Jury Charges:

### The Defendant

1.     At all times relevant to this Indictment, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, was a prominent collector and dealer in Southeast Asian art and antiquities, in particular, ancient Cambodian art. Starting in or about the early 1970s, LATCHFORD supplied major auction houses, art dealers, and museums around the world, including in the United States, with Cambodian antiquities from the ancient Khmer Empire.

2.     At all times relevant to this Indictment, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, a dual citizen of Thailand and the United Kingdom, maintained residences in Bangkok and London.

## Background on Looting of Cambodian Antiquities

3. From the mid-1960s until the early 1990s, Cambodia experienced continuous civil unrest and regular outbreaks of civil war. During these times of extreme unrest, Cambodian archeological sites from the ancient Khmer Empire, such as Angkor Wat and Koh Ker, suffered serious damage and widespread looting. This looting was widely publicized and well-known to participants in the international art market.

4. Looted artifacts usually entered the international art market through an organized looting network. Local looters, often working with local military personnel, would remove statues and architectural elements from their original locations, sometimes breaking and damaging the antiquities in the process of excavation and transportation. The antiquities would be transported to the Cambodia-Thailand border and transferred to Thai brokers, who would in turn transport them to dealers of Khmer artifacts located in Thailand, particularly Bangkok. These dealers would sell the artifacts to local or international customers, who would either retain the pieces or sell them on the international art market.

5. Widespread looting of ancient Khmer and Cambodian antiquities continued after the establishment of the modern Cambodian state in 1993. For example, in 1998, the archeological site of Banteay Chhmar in Cambodia experienced significant,

2

organized looting. In or about 2013, a group of researchers studying antiquities trafficking in Cambodia reported continuing, although abated, looting at archeological sites.

## Laws on Cultural Heritage

6.     In 1996, Cambodia enacted a law "On the Protection of Cultural Heritage" (the "1996 Law"). The 1996 Law was intended to protect cultural heritage from, among other concerns, "illegal destruction," "excavation, alienation," or "exportation." The 1996 Law defined "cultural property" as "any work produced by human agency . . . which bears witness to a certain stage in the development of a civilization . . . and whose protection is in the public interest." In addition to enabling the creation of protected archeological sites, the 1996 Law declared "[m]oveable cultural property found by chance" to be public property, and prohibited unauthorized excavation of cultural property.

7.     At all times relevant to this Indictment, the United States and Cambodia were both parties to the United Nations Educational, Scientific, and Cultural Organization ("UNESCO") 1970 Convention on the Means of Prohibiting and Preventing Illicit Import, Export, and Transport of Ownership of Cultural Property (the "1970 UNESCO Convention"), which was created to combat the illegal trade in cultural property. The 1970 UNESCO Convention required state parties to take measures to prevent the illegal import or export of cultural property, and to take appropriate

3

steps to recover and return cultural property at the request of the country of origin.

8.    In the United States, the Cultural Property Implementation Act ("CPIA"), 19 U.S.C. § 2601, et seq., implemented the 1970 UNESCO Convention. In or about December 1999, pursuant to the 1970 UNESCO Convention, Cambodia submitted a request to the United States to impose restrictions on the importation of Khmer cultural objects into the United States. That year, pursuant to the CPIA, the United States declared an emergency embargo on the importation of stone Khmer antiquities into the United States where such antiquities had been exported from Cambodia after the date of the embargo (the "CPIA Embargo"). In or about 2003, the United States and Cambodia entered into a formal Memorandum of Understanding, expanding the 1999 emergency import restrictions to include bronze Khmer antiquities.

## United States Customs and Import Regulations

9.    At all times relevant to this Indictment, individuals or entities importing goods and merchandise, including art and antiquities, into the United States, were responsible for providing truthful and accurate information to the Department of Homeland Security, Customs and Border Protection ("CBP") regarding the nature of the merchandise, its country of origin and value, so that the CBP could assess duties properly, collect accurate statistics, and determine whether other applicable legal

4

requirements, if any, had been met.

10. At all times relevant to this Indictment, an importer was permitted to use a customs broker to facilitate entry of the imported product into the United States. The customs broker relied upon information contained on the invoice, packing list, transportation entry, and manifest that accompanies the product and is typically provided to the broker by the importer of record, to create an entry summary for that item, to assess whether it warranted further inspection, and to determine what duties and tariffs were due and owing on a given import.

11. At all times relevant to this Indictment, all invoices of merchandise to be imported into the United States were required to set forth a detailed description of the merchandise, including, among other information, the commercial name by which each item was known, the purchase price of each item, and the country of origin, which is the country in which the good was produced.

## The Scheme to Sell Looted Cambodian Antiquities

12. As set forth in greater detail below, from in or about 2000, up to and including in or about 2012, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, engaged in a scheme to sell looted Cambodian antiquities on the international art market, including to dealers and buyers in the United States. As part of that scheme, in order to conceal that LATCHFORD's

5

antiquities were the product of looting, unauthorized excavation, and illicit smuggling, and to encourage sales and increase the value of his merchandise, LATCHFORD created and caused the creation of false provenance for the antiquities he was selling. In the context of art and antiquities, provenance refers to records and other evidence documenting the origin and history of ownership of an object. In particular, LATCHFORD misrepresented the provenance of Cambodian antiquities in letters, emails, invoices, and other communications. As part of the scheme, LATCHFORD also falsified invoices and related shipping documents to facilitate the international shipment of the antiquities to dealers and buyers, and to avoid the CPIA Embargo on the importation of Khmer antiquities into the United States.

13. Beginning in or about the early 1970s, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, regularly supplied an auction house based in the United Kingdom ("Auction House-1") with looted Khmer antiquities, including from the archeological site of Koh Ker in Cambodia. During his business dealings with Auction House-1, LATCHFORD conspired with representatives of Auction House-1 and a Thai dealer (the "Thai Dealer") based in Bangkok to conceal the real provenance of looted Khmer antiquities and to create false export licenses and documentation.

14. On or about November 20, 1974, a representative of

Auction House-1 ("Representative-1") wrote in a letter to a colleague, in substance and in part, that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, had agreed to consign to Auction House-1 several ancient Khmer sculptures, including a "Pre-Angkor Hari Hara" "supposedly recently excavated in Cambodia near the South Vietnamese border," a "Large Koh Ker female torso," and three stone statutes taken from the private collection of Cambodian King Sihanouk by an army general. Representative-1 wrote that "I have explored extensively with [the Thai Dealer] and Latchford how to get 'legitimate' papers for the large Koh Ker guardian and for all subsequent shipments." Representative-1 relayed, in sum, that LATCHFORD and the Thai Dealer had agreed on a plan to create false export documents and false provenance for Khmer antiquities. In particular, Representative-1 explained that the Thai Dealer had agreed to create a false provenance letter for the Koh Ker female, and that LATCHFORD and the Thai Dealer would export pieces from Thailand by simultaneously shipping a looted antiquity and a modern sculpture of similar size and subject, and later claiming the airway bill for the modern sculpture was actually the airway bill for the looted antiquity. On or about May 9, 1975, Representative-1 wrote a letter to LATCHFORD in which Representative-1 told LATCHFORD to "remember what we discussed last year" about "shipping documents," because "[t]his is especially important for any future sale to the USA."

7

15. Many of the antiquities that DOUGLAS LATCHFORD,
a/k/a "Pakpong Kriangsak," the defendant, consigned to Auction
House-1 were eventually sold to museums and collectors in the
United States. In or about 2011, an auction house in New York
("Auction House-2") offered for sale one of the Koh Ker statutes
that LATCHFORD had originally supplied to Auction House-1, a stone
guardian figure called the "Duryodhana." During the course of
preparing to sell the Duryodhana in or about 2010, Auction House-
2 communicated with LATCHFORD and a scholar of Khmer art closely
associated with LATCHFORD (the "Scholar") in order to confirm
provenance for the Duryodhana. In particular, Auction House-2
asked LATCHFORD and the Scholar to help trace the provenance of
the Duryodhana back to the early 1970s. LATCHFORD falsely stated
to Auction House-2 that he had the Duryodhana in London in 1970,
and that he had consigned it with Auction House-1 in 1975; whereas
in truth and in fact LATCHFORD had exported the Duryodhana from
Cambodia in or about 1972. About a month later, LATCHFORD changed
his story, telling Auction House-2, in substance and in part, that
he had never owned the Duryodhana. Around the same time that
LATCHFORD falsely denied owning the Duryodhana, the Scholar warned
LATCHFORD in an email, "I think maybe you shouldn't be known to
have been associated with the Koh Ker Guardian figures[.] . . .
Let's fudge a little, and just put the blame squarely on [Auction
House-1] . . . ."

8

16. Over the course of his lengthy career, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, continued to act as a conduit for recently looted Cambodian antiquities. LATCHFORD advertised newly discovered and excavated pieces for sale to trusted associates, including a Manhattan-based dealer in Southeast Asian art (the "Dealer"). For example, on or about August 12, 2005, LATCHFORD emailed the Dealer photographs of a bronze seated Buddha, visibly covered in earth. LATCHFORD explained that the photographs showed the statute "before cleaning" by a restorer, and "[w]hen it was found they took off most of the mud, or as it was, a sandy soil, it was found near Sra Srang, the lake in front of Banteay Kedi, right in the Angkor [Wat] Complex." Similarly, on or about March 13, 2006, LATCHFORD sent the Dealer an email labeled "PRIVATE AND CONFIDENTIAL -------- FOR YOUR EYES ONLY." The email contained a photograph of a bronze head. LATCHFORD explained that the head "was recently found around the site of the Angkor Borei group in the N E of Cambodia, in the Preah Vihar area. They are looking for the body, no luck so far, all they have found last week were two land mines !! What price would you be interested in buying it at? let me know as I will have to bargain for it." On or about April 23, 2007, LATCHFORD sent the Dealer another email, attaching a photograph of a standing Buddha statute that appears to be covered in dirt. LATCHFORD wrote, "Hold on to your hat, just been offered this 56 cm Angkor Borei Buddha, just

9

excavated, which looks fantastic. It's still across the border, but WOW."

17. In order to facilitate the sale and international transportation of the antiquities to buyers and to conceal that the antiquities were looted, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, created false letters of provenance and false invoices. LATCHFORD provided letters of provenance purporting to have been drafted by a particular art collector (the "False Collector"). The letters purporting to be from the False Collector typically claimed that the False Collector acquired the pieces in Vietnam or Hong Kong in the 1960s. For example, in or about 2000, LATCHFORD sold a 12th Century stone Khmer sculpture to a museum in Colorado (the "Colorado Museum") with which the Scholar was affiliated. LATCHFORD informed the Colorado Museum that he had purchased the piece from the False Collector in June 1999, and provided the Colorado Museum with a letter of provenance purportedly from the False Collector as part of the sale. However, LATCHFORD also supplied the Colorado Museum with records indicating that the statute was transported from LATCHFORD's residence in Bangkok to London in 1994, long before he claimed to have purchased it from the False Collector. The False Collector died in or about 2001. Thereafter, LATCHFORD continued to provide numerous provenance letters purportedly provided by the False Collector, while claiming, falsely, that the False Collector was

10

still alive.

18. DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, also provided fake letters of provenance, purportedly from the False Collector, to the Dealer at the Dealer's request in order to facilitate the sale of Cambodian antiquities to potential buyers. When the Dealer sold a Khmer Buddha statute to a museum in Australia (the "Australian Museum") in or about 2007, the Dealer asked LATCHFORD to supply a letter of provenance from the False Collector for provision to the Australian Museum as part of the transaction. On or about February 2, 2004, LATCHFORD sent the Dealer an unsigned provenance letter purportedly from the False Collector with the note, "[I]s this OK?" The Dealer then gave the Australian Museum the fake letter of provenance.

19. On other occasions, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, directed third parties to create false provenance documents and false invoices for him. For example, in or about September 2005, LATCHFORD sold the Dealer a 12th Century Angkor Wat-style standing Buddha statue for $90,000. LATCHFORD told the Dealer that the Buddha "needs to be cleaned, as there is surface corrosion and earth still on it," indicia of recent excavation. LATCHFORD arranged to ship the Buddha from Bangkok to an "antique consultant/collector" in Singapore (the "Singapore Collector"), and from Singapore to the Dealer's gallery in Manhattan. LATCHFORD instructed the Singapore Collector to "re-

11

invoice[]" the Buddha on the Collector's letterhead, "mentioning it has been in your collection for the past 12 years." The Singapore Collector followed LATCHFORD's instructions, creating a new, false invoice and letter of provenance stating that the Buddha had been in the Singapore Collector's private collection in Singapore for the last 12 years, omitting any mention of LATCHFORD, and falsely describing the statute as a "17th C. Bronze Standing Figure from Laos." The Singapore Collector then shipped the Buddha with the false invoice and false provenance to the Dealer in Manhattan.

20. In or about November 2011, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, sold a 10th century bronze Naga Buddha to the Dealer. When the Dealer provided the Naga Buddha to an art restorer, the restorer reported that the statute appeared to have been struck by an agricultural tool, resulting in a jagged break — damage indicative of looting. LATCHFORD and the Scholar together supplied multiple, conflicting provenances for the Naga Buddha to the Dealer. When LATCHFORD forwarded one of the Scholar's letters of provenance for the Naga Buddha to the Dealer on or about December 12 2011, LATCHFORD wrote, "Please, is this ok? Please let [the Scholar] and me know."

21. As part of the scheme to sell looted Cambodian antiquities in the United States, from at least in or about 2005 up to and including in or about 2011, DOUGLAS LATCHFORD, a/k/a

12

"Pakpong Kriangsak," the defendant, supplied false information to the CBP regarding the antiquities he imported into the United States for resale. In particular, LATCHFORD's false invoices, which formed the basis for the information provided to CBP by LATCHFORD's shipping companies and customs brokers, misstated the nature, age, country of origin, and/or value of the Cambodian antiquities. LATCHFORD misrepresented the country of origin and the age of the goods in particular in order to conceal that they were looted antiquities, and to avoid the embargo on the importation into the United States of Khmer antiquities exported from Cambodia after 1999. Frequently, LATCHFORD listed the "country of origin" as "Great Britain" or "Laos," rather than Cambodia, and often described the objects as "figures" from the 17th or 18th century.

22.    For example, on or about November 28, 2011, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, shipped the bronze Naga Buddha from London to the Dealer in Manhattan. LATCHFORD provided, and caused others to provide, false information to a shipping company and a customs broker. Specifically, LATCHFORD told the shipping company that the shipment contained an "Antique Bronze" with country of origin listed as Great Britain, valued at $25,000, when in fact, the Naga Buddha was a Cambodian antiquity valued at approximately $500,000. CBP records related to the importation of the Naga Buddha into New

13

York reflect the false information provided on the shipping invoice.

## STATUTORY ALLEGATIONS

23. From at least in or about 2000, up to and including at least in or about 2012, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

24. It was a part and object of the conspiracy that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, LATCHFORD engaged in a scheme to sell looted Cambodian antiquities by creating and causing others to create, and transmitting by means of international and interstate wire, false provenance, invoice, and shipping documents that concealed

14

and misrepresented the source, country of origin, prior owner(s), age, and/or attribution of such antiquities, in order to induce the sale and transport of such antiquities to buyers in the United States and elsewhere, and to obtain the proceeds of such sales, which proceeds were sent to LATCHFORD and others by interstate and international wire.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Offenses Against the United States)

The Grand Jury further charges:

25. The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and re-alleged as if fully set forth herein.

26. From at least in or about 2005, up to and including at least in or about 2012, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit:

a. Smuggling, in violation of Title 18, United States Code, Section 545;

b. Entry of goods by false statements, in violation of Title 18, United States Code, Section 542;

15

c.     Interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314; and

d.     Sale and receipt of stolen property, in violation of Title 18, United States Code, Section 2315.

27.   It was a part and an object of the conspiracy that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, would and did fraudulently and knowingly import and bring into the United States certain merchandise contrary to law, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported and brought into the United States contrary to law, to wit, LATCHFORD agreed with others to import and cause the importation into the United States, and to facilitate the transport, concealment, and sale of, Khmer antiquities stolen from Cambodia, which were designated archeological material banned from import pursuant to Title 19, United States Code, Section 2604, by means of providing false statements, and false and fraudulent invoices, to the Department of Homeland Security, Customs and Border Protection, contrary to Title 18, United States Code, Sections 542, 2314, and 2315, and Title 19, United States Code, Section 2606(a), in violation of Title 18, United States Code, Section 545.·

28.   It was further a part and an object of the conspiracy that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the

16

defendant, and others known and unknown, knowingly would and did enter and introduce, and attempt to enter and introduce, into the commerce of the United States, imported merchandise by means of a fraudulent and false invoice, declaration, affidavit, letter, paper, and by means of a false statement, written and verbal, and by means of a false and fraudulent practice and appliance, and make a false statement in a declaration without reasonable cause to believe the truth of such statement, and procure the making of such a false statement as to a matter material thereto without reasonable cause to believe the truth of such statement, in violation of Title 18, United States Code, Section 542, to wit, LATCHFORD, in the course of importing Cambodian antiquities for sale in the United States, agreed with others to submit and cause the submission of false entry summaries and associated invoices, packing lists, and shipping documents to the Department of Homeland Security, Customs and Border Protection, which documents falsely described the merchandise being imported into the United States by misrepresenting the country of origin, value, age, and nature or character of the merchandise.

29. It was further a part and an object of the conspiracy that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, would and did transport, transmit, and transfer in interstate and foreign commerce goods, wares, merchandise, securities, and money, of the value of $5,000

17

and more, knowing the same to have been stolen, converted, and taken by fraud, in violation of Title 18, United States Code, Section 2314, to wit, LATCHFORD agreed with others to transport and cause to be transported into the United States Cambodian antiquities which were the property of the Cambodian state pursuant to the 1996 Law on the Preservation of Cultural Heritage, and were unlawfully taken therefrom.

30. It was further a part and an object of the conspiracy that DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, and others known and unknown, would and did receive, possess, conceal, store, barter, sell, and dispose of goods, wares, merchandise, securities, and money of the value of $5,000 and more, which had crossed a State and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken, in violation of Title 18, United States Code, Section 2315, to wit, LATCHFORD agreed with others to sell and cause the sale of Cambodian antiquities in the United States, which antiquities were the property of the Cambodian state pursuant to the 1996 Law on the Preservation of Cultural Heritage, and were unlawfully taken therefrom.

### Overt Acts

31. In furtherance of the conspiracy, and to effect the illegal objects thereof, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, together with others known and

18

unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

a.     On or about February 26, 2006, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, emailed the Dealer about a "NEW FIND" "across the border," a 12th century Khmer Siva "fresh out of the ground" that "was found near the hill of Bakheng in Angkor Thom." The email was labeled "PRIVATE AND CONFIDENTIAL F Y E ONLY," and attached a photograph of a statue covered in earth. LATCHFORD later emailed the Dealer again to confirm that LATCHFORD had acquired the Siva from a seller in Cambodia, and was offering it for sale for $175,000.

b.     On or about October 18, 2009, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, shipped a 12th century Cambodian stone Naga Buddha statute from a restorer in London to the Dealer in New York, using a false shipping invoice that described the statute as a 16th century stone "seated figure" from Laos. Based on the false information LATCHFORD provided to the shipping company, United States Customs and Border Protection records falsely reflected that the country of origin of the stone Naga Buddha was Laos, rather than Cambodia, and that the value of the statute was $6,500, rather than the sale price of $175,000.

(Title 18, United States Code, Section 371.)

19

## COUNT THREE
## (Wire Fraud)

The Grand Jury further charges:

32. The allegations contained in paragraphs 1 through 22 and 31 of this Indictment are repeated and re-alleged as if fully set forth herein.

33. From at least in or about 2000 through at least in or about 2012, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LATCHFORD engaged in a scheme to sell looted Cambodian antiquities by creating and causing others to create, and transmitting by means of interstate and international wire, false provenance, invoice, and shipping documents that concealed and misrepresented the source, country of origin, prior owner(s), age, and/or attribution of such antiquities, in order to induce the sale and transport of such antiquities to buyers in the United States and elsewhere, and to obtain the proceeds of such sales,

which proceeds were sent to LATCHFORD and others by interstate wire.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Smuggling)

The Grand Jury further charges:

34. The allegations contained in paragraphs 1 through 22 and 31 of this Indictment are repeated and re-alleged as if fully set forth herein.

35. From at least in or about 2005, up to and including at least in or about November 2011, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, fraudulently and knowingly imported and brought into the United States merchandise contrary to law, and received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported and brought into the United States contrary to law, to wit, LATCHFORD imported and caused the importation, concealment, purchase, and sale of Khmer antiquities stolen from Cambodia, which were designated archeological material banned from import pursuant to Title 19, United States Code, Section 2604, by means of providing false statements and false and fraudulent invoices to the Department of Homeland Security, Customs and Border Protection, contrary to

Title 18, United States Code, Section 542.

(Title 18, United States Code, Sections 545 and 2.)

## COUNT FIVE
### (Entry of Goods by Means of False Statements)

The Grand Jury further charges:

36. The allegations contained in paragraphs 1 through 22 and 31 of this Indictment are repeated and re-alleged as if fully set forth herein.

37. From at least in or about 2005, up to and including at least in or about November 2011, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, knowingly entered and introduced, and attempted to enter and introduce, into the commerce of the United States imported merchandise by means of a fraudulent and false invoice, declaration, affidavit, letter, paper, and by means of a false statement, written and verbal, and by means of a false and fraudulent practice and appliance, and made a false statement in a declaration without reasonable cause to believe the truth of such statement, and procured the making of a such a false statement as to a matter material thereto without reasonable cause to believe the truth of such statement, to wit, LATCHFORD imported and caused the importation into the United States of Khmer antiquities by means of providing false statements and false and fraudulent invoices to the Department of Homeland Security, Customs and Border

Protection.

(Title 18, United States Code, Sections 542 and 2.)

## COUNT SIX
### (Aggravated Identity Theft)

The Grand Jury further charges:

38. The allegations contained in paragraphs 1 through 22 and 31 of this Indictment are repeated and re-alleged as if fully set forth herein.

39. From at least in or about 2000, up to and including in or about 2011, in the Southern District of New York and elsewhere, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, LATCHFORD used and aided and abetted the use of the name of the False Collector to create false and fraudulent provenance for Cambodian antiquities in connection with the conspiracy to commit wire fraud, as alleged in Count One of this Indictment, and wire fraud, as alleged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(c)(5), and 2.)

## FORFEITURE ALLEGATION

40. As a result of committing the offenses alleged in Counts One, Two and Three of this Indictment, DOUGLAS LATCHFORD,

23

a/k/a "Pakpong Kriangsak," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

41. As a result of committing the offenses alleged in Counts Four and Five of this Indictment, DOUGLAS LATCHFORD, a/k/a "Pakpong Kriangsak," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B), and Title 19, United States Code, Section 1595a(c), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

42. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred or sold to, or deposited with, a third person;

24

c.     has been placed beyond the jurisdiction of the
Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section  853(p) and Title 28, United States
Code, Section 2461(c), to seek forfeiture of any other property
of the defendant up to the value of the above forfeitable
property.

> (Title 18, United States Code, Section 982,;
> Title 21, United States Code, Section 853; and
> Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DOUGLAS LATCHFORD,
a/k/a "Pakpong Kriangsak,"

Defendant.

### SEALED INDICTMENT

(18 U.S.C. §§ 1349, 371, 1343, 545,
542, 1028A, & 2.)

GEOFFREY S. BERMAN
United States Attorney

Foreperson

KL
10/17/19

Sealed Indictment
Arrest Warrants Issued

Stewart D. Aaron
USMJ.